UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JOHN L. MINNICH,                        )
                                        )
                 Plaintiff,             )
                                        )
        v.                              )       No.  1:05CV28 FRB
                                        )
JO ANNE B. BARNHART,                    )
Commissioner of Social Security,        )
                                        )
                 Defendant.             )


<u>**MEMORANDUM AND ORDER**</u>

This cause is on appeal for review of an adverse determination by the Social Security Administration.  All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On December 16, 2002, plaintiff John L. Minnich filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, <u>et seq.</u>, in which he claimed he became disabled on August 6, 2002.  (Tr. 38-40.)  On initial consideration, the Social Security Administration denied plaintiff's claim for benefits.  (Tr. 24, 28-31.)  On June 24, 2004, a hearing was held before an Administrative Law Judge (ALJ).  (Tr. 231-89.)  Plaintiff testified and was represented by counsel.  Plaintiff's sister and a vocational expert also testified at the hearing.  On August 13, 2004, the ALJ issued a decision denying

- 1 -

plaintiff's claim for benefits.  (Tr. 7-17.)  On December 21, 2004, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 3-5.)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on June 24, 2004, plaintiff testified in response to questions posed by the ALJ and counsel.  Plaintiff is forty-three years of age.  (Tr. 235.)  Plaintiff weighs 306 pounds.  (Tr. 269.)  Plaintiff graduated from high school and subsequently received training in law enforcement and at a technical college in machine shop training.  (Tr. 237.)  Plaintiff lives alone in his home which sits on forty acres of land.  (Tr. 236, 248-49.)

From 1979 to 1994, plaintiff worked as a logger at a sawmill.  (Tr. 74.)  During the summer of 1980 through August 1981, and again from 1983 to early 1986, plaintiff worked part-time at the local sheriff's office.  (Tr. 239.)  From November 1994 to July 1997, plaintiff worked as a truck driver for various trucking companies.  From July 1997 to August 2002, plaintiff was self-employed as an over-the-road truck driver.  (Tr. 73, 238.)  Plaintiff testified that he last worked on August 6, 2002.  (Tr. 239.)

Plaintiff testified that he suffered a heat stroke on August 6, 2002, upon which plaintiff's brother took him to his

doctor. Plaintiff testified that by the nature of his doctor's advice, he had the impression that there was very little medical treatment for heat stroke itself and that "you get over it or you don't[.]" (Tr. 239-40.) Plaintiff testified that in response to the heat stroke, his physician recommended that he undergo a cardiac work-up but that he could not afford it. (Tr. 260-61.) Plaintiff testified that his coordination and balance have deteriorated since the stroke, but that he does not use a cane or walker. (Tr. 242-43.) Plaintiff testified that he must sit to put on his pants because of his poor balance and coordination. (Tr. 242.)

Plaintiff testified that he has had three heat strokes and that he has problems when he overheats with exertional activity. Plaintiff testified that the condition is worse in hot weather. Plaintiff testified that he shakes, gets dizzy and experiences throbbing in his head with such episodes. Plaintiff testified that he experiences headaches only with activity and that such headaches are intermittent in nature. Plaintiff testified that he takes Tylenol and sometimes lies down when he has such headaches. (Tr. 264.)

Plaintiff testified that was involved in a truck accident in 1996 whereupon he suffered a head injury. (Tr. 240, 243.) Plaintiff testified that debris became lodged in his head and that he was advised by a plastic surgeon that, as long as the debris did not fester, it would just have to work its way out on its own.

(Tr. 243-44.)  Plaintiff testified that he has memory lapses and many headaches.  (Tr. 243.)  Plaintiff testified that he takes Tylenol for his headaches which provides intermittent relief.  (Tr. 244.)

Plaintiff testified that he has back problems as a result of an incident in 1986 and that since his 1996 accident, he experiences pain because of dislocated joints.  (Tr. 262-63.) Plaintiff testified that his back problems become aggravated if he sits too long.  (Tr. 246, 263.)  Plaintiff testified that he also experiences discomfort when he stands a while.  Plaintiff testified that he usually lies down when his back really bothers him inasmuch as that is all that provides him relief.  (Tr. 246.)  Plaintiff testified that he experiences pain all over and that he sees a chiropractor once or twice a week for the condition.  (Tr. 263.) Plaintiff testified that he has never had injection therapy or physical therapy for his back condition.  (Tr. 254.)

Plaintiff testified that he was diagnosed with sugar diabetes in 1996 and that he takes Avandia and Amaryl for the condition.  (Tr. 240-41.)  Plaintiff testified that his feet are continually numb which causes him to sometimes stumble, and that he has had foot ulcers and infections because of the disease.  (Tr. 259-60.)  Plaintiff testified that he is on a restricted diet and walks approximately one mile every day for the condition. Plaintiff testified that at about the time he suffered the heat stroke, he had become disillusioned with his doctor and had

problems with his diabetes medications and stopped taking them altogether but subsequently restarted them. (Tr. 241-42.) Plaintiff testified that he experienced weight gain with Avandia, gaining approximately forty pounds when he restarted the medication in September 2002. (Tr. 241-42, 267.) Plaintiff testified that his doctor has instructed him to check his blood sugar level twice a day but that he cannot afford to do so. (Tr. 260.) Plaintiff testified that a box of sixty test strips costs approximately Fifty Dollars. (Tr. 261.) Plaintiff testified that he has his blood sugar checked every three months and that, from such levels, it appears that his medication, diet and exercise do not control his diabetes. (Tr. 261-62.)

Plaintiff testified that he has suffered from high blood pressure during the previous one and one-half years for which he takes Tiazac. Plaintiff testified that he is on a restricted diet due to the condition. (Tr. 241.)

Plaintiff testified that he also suffers from allergies for which he takes medication, and that he goes outside "as long as [he] can stand it[.]" (Tr. 276-77.)

As to his daily activities, plaintiff testified that he arises at 6:00 or 7:00 a.m., gets dressed and fixes himself breakfast. (Tr. 244-45.) Plaintiff testified that he then sometimes becomes fatigued and must rest whereupon he usually listens to the radio or reads. (Tr. 245-46.) Plaintiff testified that he does not like to just sit around and that he tries to get

up and get out of the house. Plaintiff testified that he usually visits his sister and her children and then goes to the pasture to check on cattle, ten cows, which he owns. (Tr. 246-47.) Plaintiff testified that he then returns home and lies down. (Tr. 247.) Plaintiff testified that, on average, he lies down twice a day for approximately one hour. (Tr. 266.) Plaintiff testified that he goes to bed at approximately 10:00 p.m. (Tr. 247.) Plaintiff testified that he also does a lot of target practice with a rifle and pistol when he can afford the ammunition. (Tr. 248.) Plaintiff testified that he engages in such activity once or twice a week and does so for thirty minutes to an hour each time. (Tr. 266.) Plaintiff testified that he used to hunt but has not done so since his heat stroke because of his ability to sit still and/or walk for periods of time. (Tr. 252.) Plaintiff testified that he attends church three times a week. (Tr. 249.) Plaintiff testified that he plays the banjo at church and sometimes gets together with fellow musicians an additional night or two each week for practice for one or two hours. (Tr. 249, 266.)

Plaintiff testified that he performs most of his own housework and fixes his own meals because he lives alone. (Tr. 245, 247-48.) Plaintiff testified that he does his own grocery shopping. (Tr. 250-51.) Plaintiff testified that he sometimes goes out to eat. (Tr. 248.) Plaintiff testified that his sister washes his laundry because he does not have a washing machine or dryer, and that he hangs the laundry on the clothesline to dry.

(Tr. 250-51.) Plaintiff testified that he receives assistance from his niece's husband if any outdoor maintenance is needed with his property, such as fence repair. (Tr. 248.) Plaintiff testified that other family members help him feed the cattle in the winter. (Tr. 250.)

Plaintiff testified that he performs volunteer work at a food pantry once a month and that he sometimes has difficulty keeping up with the quick pace of the work, causing him to overheat. (Tr. 257-59.) Plaintiff testified that standing on the concrete floor during such work causes him to experience back spasms for the next couple of days. Plaintiff testified that he also experiences fatigue for a couple of days after such work. (Tr. 259.)

Plaintiff testified that he has driven his mother to St. Louis on multiple occasions within the previous year for her medical treatment. Plaintiff testified that the distance traveled for such a trip is approximately 184 miles one way. (Tr. 251.) Plaintiff testified that he stops at least twice each way during such trips so that he may stand and walk around a bit before continuing the drive. (Tr. 266.) Plaintiff testified that he drove the approximately fifty-mile trip to the hearing, stopping after eighteen miles to make a telephone call. (Tr. 236.)

Plaintiff testified that he can currently lift approximately fifty pounds and does such lifting in association with feeding his cattle. (Tr. 255.)

B.   Testimony of Plaintiff's Sister

Mary Dawson, plaintiff's sister, testified at the hearing in response to questions posed by the ALJ and counsel.  Ms. Dawson testified that she sees plaintiff every day and that she gets the impression from him that he rests quite a bit during the day and does not engage in much activity other than taking care of his cattle and taking care of his personal needs.  Ms. Dawson testified that her son helps plaintiff with outdoor chores.  (Tr. 271.)  Ms. Dawson testified that plaintiff has experienced some memory loss since his accident in 1996 but that she has never noticed him getting lost or having the need to seek directions when employed as a truck driver.  Ms. Dawson testified that since his heat stroke in 2002, plaintiff has been unable to do any work without having to stop and rest.  (Tr. 271-72.)

C.   Testimony of Vocational Expert

John F. McGowan, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.  Mr. McGowan classified plaintiff's previous work as a logger as heavy, unskilled and hazardous, with no transferability of skills.  (Tr. 274.)  Mr. McGowan classified plaintiff's past work as a truck driver as medium to heavy work and semi-skilled, with no transferability of skills.  (Tr. 275-76.)

The ALJ asked Mr. McGowan to assume an individual of plaintiff's age, education and work experience and to assume "that the person could occasionally lift up to 50 pounds, frequently lift

25, stand and/or walk about six hours in an eight hour work day
with normal breaks and sit about six hours in an eight hour work
day with normal breaks." (Tr. 278.)  Mr. McGowan testified that
such a person could not perform plaintiff's past work as a logger
or as a truck driver as plaintiff performed such work, but that
such a person could perform work as a truck driver as it is
performed in the national economy.  (Tr. 278.)  The ALJ asked Mr.
McGowan to further assume that, in addition, such an individual

> should avoid climbing ladders or open
> scaffolds. And could occasionally balance,
> stoop, kneel, crouch and crawl. And the
> person should avoid concentrated exposure to
> extremes of . . . cold.
>
> . . .
>
> And the person should avoid moderate exposure
> to heat . . . in that the person would have to
> work in a climate controlled environment in
> the sense of air conditioning. Generally
> avoid humidity, concentrated exposure to
> humidity, vibration and concentrated –
> constant vibration. And also avoid
> concentrated exposure to fumes, odors, dust,
> gasses, etc., and also should avoid . . .
> working around dangerous – at dangerous
> unprotected heights and around dangerous
> unprotected machinery.

(Tr. 278-79.)

Mr. McGowan testified that such a person could perform cashiering-
type jobs and assembly work.  (Tr. 280).  Mr. McGowan testified
that, in the surrounding region, there were 2,400 hand assembly
jobs, 283 electrical component assembly jobs, 1,460 cashiering

jobs, and 320 reception information clerk jobs. (Tr. 280-81.) Mr. McGowan testified that twenty-five percent of such delineated jobs are performed at the light level of exertion, with the remainder being performed at the sedentary level. (Tr. 281.) Mr. McGowan further testified that if such a person were required to have a discretionary sit/stand option, the majority of jobs at the light and sedentary levels would be precluded. (Tr. 281-82.)

Finally, Mr. McGowan testified that a person who could work a total of only four hours a day would be precluded from competitive employment. (Tr. 282-83.)

### III. Medical Records

A.  <u>Medical Sources</u>

Plaintiff was admitted to the emergency room at St. John's Regional Health Center on September 30, 1996, after having been involved in a motor vehicle accident. Plaintiff suffered a cervical spine fracture and an extensive scalp wound. (Tr. 129.) X-rays and a CT scan of the cervical spine showed fracture of the C3 with minimal compression. (Tr. 137, 138, 141.) A CT scan of the head showed foreign bodies in the soft tissues over the right temporal and parietal area. (Tr. 139.) An MRI of the cervical spine taken October 5, 1996, showed a C3 fracture without core injury. (Tr. 129, 136.) There was no evidence of herniated nucleus pulposus or other significant compromise of the spinal canal. (Tr. 136.) During plaintiff's hospital stay, it was

determined that plaintiff was diabetic and plaintiff was placed on insulin. (Tr. 129.) There appeared to be no signs of neuropathy in the lower extremities. (Tr. 148.) Plaintiff was discharged on October 9, 1996. Upon discharge, plaintiff was diagnosed with open right temporoparietal scalp wound, C3 fracture, insulin-dependent diabetes mellitus, obesity, and possible bilateral brachial plexus contusions versus old injury. (Tr. 129.) Plaintiff was instructed to follow up with his physician for diabetes control. (Tr. 130.)

On May 13, 2002, plaintiff visited Dr. Diana Koenig at the Ozarks Medical Center complaining of eye irritation. Dr. Koenig noted plaintiff to have previously been diagnosed with type-II diabetes mellitus but that plaintiff had been off of his medications for one year. (Tr. 77.) Plaintiff reported that Glucophage[1] caused edema and that he was allergic to insulin. (Tr. 78.) Upon examination, Dr. Koenig diagnosed plaintiff with conjunctivitis and environmental allergies and medication was prescribed. (Tr. 77.)

Plaintiff visited Dr. Koenig on August 6, 2002, for heat exhaustion. (Tr. 79.) Plaintiff complained of experiencing dizziness and headaches for a short while. Plaintiff reported that he had been outside for three hours working on his truck and that he got hot and very sweaty. Plaintiff reported that his blood

_____

[1]Glucophage is indicated as an adjunct to diet to lower blood glucose in patients with type-II diabetes. Physicians Desk Reference 1005-06 (55th ed. 2001).

sugar was low prior to the dizzy spell.  (Tr. 80.)  Plaintiff's diabetes condition was noted.  Plaintiff was instructed to have his blood sugar level checked and it was opined that Avandia or Actos could be started for the condition.  (Tr. 79.)

On August 7, 2002, plaintiff appeared at the Ozarks Medical Center to measure blood sugar levels.  (Tr. 76.)  It was noted that plaintiff had been off of all of his medications for months and that he did not follow his diet.  (Tr. 81.)  On August 8, 2002, Dr. Koenig prescribed Avandia[2] for plaintiff's uncontrolled type-II diabetes mellitus and instructed plaintiff to return in three months for a recheck.  (Tr. 76.)

Plaintiff returned to Dr. Koenig on August 23, 2002, who noted the control of plaintiff's diabetes to have improved on Avandia.  Plaintiff reported having abrasions on his feet which did not appear to Dr. Koenig to be infected.  Plaintiff was prescribed Lortisone cream and was instructed to follow up in four days.  (Tr. 88.)  On August 27, Dr. Koenig noted the sore on plaintiff's left foot to be healing, and that plaintiff's sugar level had decreased.  (Tr. 90-91.)  It was noted that plaintiff was now checking his own blood sugar levels.  (Tr. 91.)  Plans were discussed for diabetes control.  (Tr. 90.)  Plaintiff reported that his job was ending that month and that he needed to find a new job.  (Tr. 91.)

_____

[2]Avandia is indicated as an adjunct to diet and exercise to improve glycemic control in patients with type-II diabetes mellitus.  Physicians Desk Reference 3071-73 (55th ed. 2001).

Plaintiff returned to Dr. Koenig on August 30, 2002, who noted plaintiff's diabetes condition to be doing okay on Avandia. Dr. Koenig noted plaintiff's blood pressure to be elevated. Plaintiff reported that he continued to be sensitive to heat and Dr. Koenig questioned whether plaintiff had suffered a heat stroke rather than heat exhaustion as previously diagnosed. Plaintiff was given information regarding heat exhaustion. (Tr. 92.)

On September 4, 2002, Dr. Koenig noted plaintiff to have chronic/allergic sinusitis and instructed plaintiff to start using steroid nasal spray. (Tr. 94.)

On September 12, 2002, Dr. Koenig noted plaintiff's blood sugar level to be at the best value since plaintiff became diabetic and that plaintiff's diabetes condition had improved with Avandia, which was noted to be a high risk medication. Plaintiff was instructed to return to Dr. Koenig in November 2002 to have his blood sugar checked. (Tr. 101.)

On October 16, 2002, plaintiff visited Dr. Koenig and complained of an infected diabetic ulcer on his left ankle. Plaintiff reported that he had the ulcer for two to three months but that it had recently worsened. Plaintiff also reported that his feet had become stiff and painful during the previous few weeks. Plaintiff was prescribed Levaquin, an antibiotic. (Tr. 103-04.)

On October 30, 2002, plaintiff visited Dr. Bruce at the Ozarks Medical Center and complained that the ulcer on his left

foot was not healing and that he experienced dull, steady pain.
Plaintiff also reported that he experienced dizziness with shaking
and throbbing in his head. Plaintiff reported that he felt light-
headed and also experienced weakness in his legs. Plaintiff was
prescribed Antivert[3] and an antibiotic, and a boot was ordered.
(Tr. 108-09.)

On November 4, 2002, Dr. Bruce noted plaintiff's ulcers
to continue. It was determined that the affected area would be re-
wrapped. (Tr. 111.)

On November 7, 2002, plaintiff returned to Dr. Koenig to
have his blood sugar checked and reported that he experienced an
episode of near syncope[4] the previous night upon exertion.
Plaintiff reported that he tried eating after the episode but was
unable to increase his blood sugar level. Dr. Koenig noted there
to be diabetic ulcers about plaintiff's left foot. (Tr. 76.)

On December 2, 2002, plaintiff reported to Dr. Koenig
that he experienced episodes of weakness and shortness of breath
walking up a hill six days prior and felt exhausted for four days
thereafter. Plaintiff's prescription for Avandia was refilled and
plaintiff was instructed to return in February 2003 to have his

_____

[3]Antivert is used to prevent and treat dizziness associated
with motion sickness and vertigo. Medline Plus (revised Feb. 24,
1999)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202343.ht
ml>.

[4]"Loss of consciousness and postural tone caused by diminished
cerebral blood flow." Stedman's Medical Dictionary 1720 (26th ed.
1995).

blood sugar checked.  (Tr. 76.)

Plaintiff returned to Dr. Koenig on December 20, 2002, for acute sinusitis.  Plaintiff's blood pressure was noted to be intermittently elevated.  Dr. Koenig noted plaintiff's ulcers to have healed.  (Tr. 114.)

On May 19, 2003, Dr. Koenig completed a Medical Source Statement in which she listed plaintiff's primary diagnoses to be: heat intolerance; near syncope (etiology unclear) and tachycardia; poor coordination; pes planus and foot pain; and gout.  Dr. Koenig listed plaintiff's secondary diagnoses to be:  diabetes mellitus; hypertension; environmental allergies; morbid obesity; phlebitis; probably early diabetic neuropathy; and diabetic leg ulcers.  (Tr. 124.)   Dr. Koenig opined that plaintiff retained the maximum capacity to frequently lift and/or carry ten pounds and occasionally lift and/or carry twenty-five pounds.  Dr. Koenig opined that plaintiff could sit a total of one hour in an eight-hour work day, stand a total of one hour in an eight-hour work day, and sit and/or stand for a total of four hours in an eight-hour work day.  (Tr. 125.)  Dr. Koenig opined that plaintiff could occasionally push and/or pull, including hand and foot controls. Dr. Koenig further opined that plaintiff could never engage in climbing, balancing, kneeling, and crouching; could occasionally engage in stooping, bending and reaching; and could frequently engage in handling, fingering and feeling.  (Tr. 125-26.)  Dr. Koenig opined that plaintiff should avoid moderate exposure to

humidity and hazards; avoid concentrated exposure to machinery and fumes, odors, dust, gases, poor ventilation, etc., due to environmental allergies; and avoid all exposure to heat and heights. Dr. Koenig noted that plaintiff has had three episodes of heat stroke and "entirely lost his heat tolerance with the [third] episode." (Tr. 126.)

On August 7, 2003, Dr. Koenig noted plaintiff's blood sugar level to continue to be a little high. (Tr. 164.)

Plaintiff visited Dr. Koenig on November 12, 2003, for refills of his medications, Avandia and Tiazac.[5] Plaintiff denied having any pain and reported that he experiences no shortness of breath beyond what is normal with exertion. Plaintiff reported having no chest pain or pressure. Plaintiff reported experiencing three or four episodes of near syncope since August 25, 2003. Dr. Koenig noted plaintiff to have had hypertension and tachycardia for one year. (Tr. 158.) Plaintiff was diagnosed with near syncope, heat intolerance, type-II diabetes mellitus, and intermittent tachycardia. (Tr. 168.)

On January 30, 2004, Dr. Koenig reported to the American National Insurance Company that plaintiff was completely disabled and unable to perform even sedentary work due to his unpredictable episodes of hypoglycemia, unexplained near syncopal episodes, heat stroke, episodes of tachycardia, and hypertension. Dr. Koenig

---

[5]Tiazac is indicated for the treatment of hypertension. Physicians Desk Reference 1270-71 (55th ed. 2001).

stated that she was unsure of the expected duration of plaintiff's limitations. Dr. Koenig opined that plaintiff needed a cardiology work up due to the unknown etiology of his near syncopal episodes and tachycardia, but that plaintiff could not afford the evaluation. (Tr. 157.)

Plaintiff returned to Dr. Koenig on February 6, 2004, and reported that he had been out of his blood pressure medication for one month. (Tr. 159.) Plaintiff also complained of having cut a log in an area with poison ivy and that he was experiencing a sinus headache and symptoms consistent with sinusitis. (Tr. 166.) Dr. Koenig noted plaintiff to be taking Cardizem,[6] Tiazac, Nasacort,[7] and Avandia. Dr. Koenig noted plaintiff's hypertension to have improved but that plaintiff continued to need his medications. Dr. Koenig noted plaintiff's diabetes to be poorly controlled. It was noted that plaintiff had episodes of syncope and tachycardia. Plaintiff was instructed to add Glucophage, Tequin[8] and Levaquin to his medication regimen. Plaintiff was instructed to return in three months. (Tr. 159.)

On March 19, 2004, plaintiff returned to Dr. Koenig and

---

[6]Cardizem is indicated for the treatment of tachycardia. Physicians Desk Reference 695 (55th ed. 2001).

[7]Nasacort is indicated for the treatment of the nasal symptoms of seasonal and perennial allergic rhinitis. Physicians Desk Reference 719 (55th ed. 2001).

[8]Tequin is indicated for the treatment of acute sinusitis. Physicians Desk Reference 1025-28 (55th ed. 2001).

complained of a sinus infection and possible infection of his left great toe. Plaintiff reported that he injured his toe three or four months prior but that it recently had become red, swollen and painful. Plaintiff was diagnosed with acute sinusitis/bronchitis, paxonychia of the left great toenail, type-II diabetes mellitus, and hypertension with elevated blood pressure. Plaintiff was given instruction on medications. (Tr. 167.)

On May 13, 2004, plaintiff reported to Dr. Koenig that he was experiencing shortness of breath and numbness and tingling in both feet about the toes. (Tr. 160.) Dr. Koenig noted plaintiff's blood sugar level to have worsened. (Tr. 163.) Dr. Koenig noted plaintiff to continue to have bad reactions to the heat by just walking outside. Dr. Koenig diagnosed plaintiff with acute sinusitis and diabetic neuropathy and determined to add Amaryl[9] to plaintiff's Avandia therapy. Plaintiff was instructed to return in three months. (Tr. 160.)

On June 9, 2004, plaintiff visited Dr. Koenig and reported symptoms consistent with sinusitis, including headaches. Dr. Koenig noted plaintiff's feet to be slightly numb and that plaintiff's left ankle was slightly excoriated with no infection. Plaintiff was diagnosed with type-II diabetes mellitus and diabetic neuropathy; acute sinusitis (recurrent); hypertension–controlled;

_____

[9]Amaryl is indicated as an adjunct to diet and exercise to lower the blood glucose in patients with non-insulin dependent type-II diabetes mellitus. Physicians Desk Reference 678-79 (55th ed. 2001).

and heat intolerance. Plaintiff was instructed to return in two
months. (Tr. 161.)

B. <u>Other Sources</u>

On January 27, 2003, a reviewing, non-examining
consultant with Disability Determinations completed a Residual
Functional Capacity Assessment (Tr. 117-23) wherein it was opined
that plaintiff could occasionally lift and carry fifty pounds and
could frequently lift and carry twenty-five pounds. It was further
opined that plaintiff could stand and/or walk (with normal breaks)
for a total of six hours in an eight-hour workday, and could sit
(with normal breaks) for a total of six hours in an eight-hour
workday. It was opined that plaintiff was unlimited in his ability
to push and/or pull. (Tr. 117.) It was further opined that
plaintiff had no postural, manipulative, visual, or communicative
limitations. (Tr. 118-20.) It was opined that plaintiff should
avoid concentrated exposure to hazards, such as machinery and
heights. (Tr. 120.)

From November 2001 through June 2004, plaintiff visited
chiropractor C. Gerald St. John on at least a weekly basis for
continual complaints of pain and/or stiffness in his hips, knees,
legs, feet, low back, neck, arms, and shoulders. Chiropractic
adjustments provided only temporary relief. (Tr. 170-78, 179-186.)
On November 19, 2002, it was noted that the pain in plaintiff's
legs and hips make him stumble, although he was able to haul two
loads of wood the previous day and split it that morning. (Tr.

175.)  On January 4, 2003, plaintiff complained that his fingers were nearly numb.  (Tr. 176.)  On March 29, 2003, plaintiff reported that he recently had two episodes of throbbing headaches and a "swimming" sensation in his head.  Plaintiff reported that he was hauling wood in a wheelbarrow and began feeling heat stroke sensations when it was only sixty-one degrees.  (Tr. 177.)  Throughout plaintiff's treatment, pain questionnaires completed by Dr. St. John and plaintiff showed plaintiff's pain to be worsening with such pain resulting in additional functional limitations.  (Tr. 187-226.)

On July 2, 2004, Dr. St. John completed a Medical Source Statement (Tr. 228-30) wherein he opined that plaintiff could frequently lift and/or carry five pounds and occasionally lift and/or carry ten pounds.  (Tr. 229.)  Dr. St. John further opined that plaintiff could stand a total of one hour in an eight-hour workday, could sit a total of two hours in an eight-hour workday, and could sit and/or stand for a total of three hours in an eight-hour workday.  Dr. St. John further opined that plaintiff could never engage in pushing and/or pulling, and that plaintiff should never climb, balance or reach.  Dr. St. John further opined that plaintiff could only occasionally stoop, kneel, crouch, bend, and handle; and could frequently finger and feel.  (Tr. 229-30.)  Dr. St. John opined that plaintiff should avoid all exposure to heights, noting that balance could be a problem.  (Tr. 230.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the disability insured status requirements of the Social Security Act as of August 6, 2002, and continued to meet them through the date of the decision. The ALJ also found that plaintiff had not engaged in substantial gainful activity since August 6, 2002. The ALJ found plaintiff's impairments to be history of several heat strokes, insulin-dependent diabetes mellitus with early peripheral neuropathy, and hypertension, but that such impairments did not, either singly or in combination, meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff's and his witnesses' allegations of symptoms precluding the performance of any sustained work activity not to be credible. The ALJ found plaintiff to have the residual functional capacity (RFC) to perform the exertional and non-exertional requirements of work except for sitting or standing more than one hour at a time; climbing, balancing, kneeling, and crouching; more than occasional pushing, pulling, stooping, bending, or reaching; work at unprotected heights or around dangerous moving machinery; or any concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergies, pollutants, and atmospheric irritants. The ALJ determined plaintiff unable to perform his past relevant work. The ALJ found plaintiff's RFC to perform the full range of at least

light work to be reduced by his limitations as set out above. Based on plaintiff's age, education, work experience, and exertional capacity for light and sedentary work, the ALJ found there to exist a significant number of other jobs in the national economy that plaintiff could perform, as indicated by the vocational expert. The ALJ thus concluded that plaintiff was not under a disability at any time through the date of the decision. (Tr. 15-17.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42

U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence.  Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068(8th

Cir. 2000)). A Commissioner's decision may not be reversed merely because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred in failing give greater weight to the opinions of plaintiff's treating physicians. Plaintiff also claims that the ALJ erred in his RFC determination in that he failed to consider plaintiff's non-exertional impairments of pain and postural and environmental limitations, and erroneously found plaintiff to have the RFC to perform sedentary and/or light work inasmuch as his finding that plaintiff could sit and/or stand no more than one hour at a time precluded such work. Finally, the plaintiff claims that the ALJ erred in his determination to find plaintiff and his witnesses not credible.

A. <u>Credibility Determination</u>

The ALJ found that the allegations made by plaintiff and his witnesses that plaintiff's limitations prevented him from performing work were not credible. Plaintiff claims that the ALJ erred in this determination and specifically, that the ALJ failed to recognize that plaintiff's strong work record should have afforded him substantial credibility. For the following reasons, plaintiff's claim fails.

In determining the credibility of a claimant's subjective

complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ identified the Polaski factors and set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not credible. Specifically, the ALJ noted that when plaintiff took his medication, his diabetes and hypertension conditions were controlled. See Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998) (impairment not disabling if controlled by medication and treatment); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993)

(same); see also Tellez, 403 F.3d at 957 (failure to take medications as prescribed supported adverse credibility determination). The ALJ also noted that plaintiff did not complain to his treating physician of any frequent headaches or memory loss. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (failure to seek medical assistance for alleged impairments contradicts subjective complaints of disabling conditions); see also McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993) (failure to seek treatment coupled with medical evidence which shows claimant not to have reported symptoms to physician supports ALJ's adverse credibility determination). Indeed, the ALJ noted that despite plaintiff's claims of memory loss, he nevertheless is able to drive and does not forget his whereabouts. The ALJ also noted that plaintiff has had no surgery or inpatient hospitalizations since the 1996 motor vehicle accident, and that he has not been referred for pain therapy or physical therapy. The ALJ also noted that plaintiff did not take strong pain medication, and indeed the record shows plaintiff to take only Tylenol for his pain. See Rankin v. Apfel, 195 F.3d 427, 430 (8th Cir. 1999) (primary use of over-the-counter remedies for pain relief discredits claimant's complaints of pain); Barrett v. Shalala, 38 F.3d 1019, 1023-24 (8th Cir. 1994) (failure to seek aggressive medical treatment not suggestive of disabling pain). The ALJ also noted that to the extent plaintiff had been prescribed medication, there is no documented evidence that he experiences any uncontrollable side

effects therefrom.  The ALJ also noted there to exist no x-rays or other diagnostic tests to support plaintiff's claim of musculoskeletal pain.  <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003) (lack of supporting objective medical evidence may be considered as a factor in evaluating credibility of complaints).  The ALJ also noted that throughout the administrative hearing, he observed plaintiff to walk in and out of the hearing room without an assistive device, and that the plaintiff sat normally throughout the hearing, which lasted about eighty-five minutes.  The ALJ also observed that plaintiff moved his neck, shoulders, arms, hands, and fingers without noticeable difficulty. The ALJ's personal observations of the plaintiff's demeanor during the hearing are relevant in making credibility determinations. <u>Johnson</u>, 240 F.3d at 1147-48.

Most notable to the undersigned is the extent to which plaintiff's daily activities, as he describes them, run counter to his claims of disabling symptoms.  The ALJ specifically noted plaintiff's testimony that he continues to drive, and indeed drove the fifty-mile trip for purposes of the hearing and drove to St. Louis on multiple occasions during the previous year; that he feeds, dresses and bathes himself, although sometimes slowly; that he feeds ten head of cattle each day; that he tries to walk a mile each day; that he can lift a fifty-pound bag of feed or salt mix; that he reads, builds fires, attends church three times a week, and plays a banjo; that he visits with his family every day; that he

lies down twice a day for an hour at a time but does not like to sit in place too long; and that he engages in target practice with a rifle or pistol one or two times a week for thirty to sixty minutes each time. The fact that plaintiff is able to carry on a normal life contributes to the ALJ's finding that plaintiff's complaints of disabling impairments are not credible. Johnson, 240 F.3d at 1148-49; Gray v. Apfel, 192 F.3d 799, 804 (8th Cir. 1999) (extensive daily activities inconsistent with level of pain alleged). See also, e.g., Shannon v. Chater, 54 F.3d 484, 487 (8th Cir. 1995) (plaintiff cooked breakfast, "sometimes" needed help with household cleaning and other chores, visited friends and relatives, and attended church twice a month); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (plaintiff lived alone, drove, shopped for groceries, and did housework with some help from neighbor).

Substantial evidence on the record as a whole supports the ALJ's findings as well as his determination that the inconsistencies in the record as a whole serve to discredit plaintiff's complaints of disabling symptoms. To the extent plaintiff claims that his strong work record bolsters his credibility, the inconsistencies in the record as a whole, as set out above, significantly outweigh this lone factor of credibility. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). In addition, to the extent plaintiff's witnesses supported his claims of disabling symptoms, the ALJ properly discredited their

- 29 -

statements inasmuch as, like plaintiff's testimony, such statements were inconsistent with the record. See Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992) (adverse credibility determination of lay witnesses supported by same evidence that proved claimant's claims not credible).

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson, 956 F.2d at 841.

B.   Weight Given to Treating Sources

Plaintiff claims that the ALJ erred in failing to give greater weight to the opinion of plaintiff's treating physician, Dr. Koenig, and to the opinion of plaintiff's chiropractor, Dr. St. John.

1.   *Dr. Koenig*

In his written decision, the ALJ determined to accept the restrictions set out in Dr. Koenig's May 2003 Medical Source Statement, "except for the part where she implies that the claimant

could not stand or sit longer than 4 hours a day." (Tr. 14.)
Plaintiff argues that no medical evidence contradicted this
specific finding by Dr. Koenig and thus that the ALJ erred in not
crediting Dr. Koenig's assessment in its entirety.  Indeed, the
plaintiff claims that the ALJ appeared to conveniently mold this
evidence to fit his own predisposition.  For the following reasons,
the plaintiff's argument must fail.

The Regulations require the Commissioner to give more
weight to the opinions of treating physicians than other sources.
20 C.F.R. § 404.1527(d)(2).  A treating physician's assessment of
the nature and severity of a claimant's impairments should be given
controlling weight if the opinion is well supported by medically
acceptable clinical and laboratory diagnostic techniques and is not
inconsistent with other substantial evidence in the record.  <u>Id.</u>
This is so because a treating physician has the best opportunity to
observe and evaluate a claimant's condition,

> since these sources are likely to be the
> medical professionals most able to provide a
> detailed, longitudinal picture of [a
> claimant's] medical impairment(s) and may
> bring a unique perspective to the medical
> evidence that cannot be obtained from the
> objective medical findings alone or from
> reports of individual examinations, such as
> consultative examinations or brief
> hospitalizations.

<u>Id.</u>

As such, evidence received from a treating physician must be given

great weight with deference given to such evidence over that from consulting or non-examining physicians.  See <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992); <u>Henderson v. Sullivan</u>, 930 F.2d 19, 21 (8th Cir. 1991).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion.  20 C.F.R. § 404.1527(d)(2).  Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty.  <u>Id.</u>  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  <u>Id.</u>

In this cause, the ALJ determined to give substantial weight to Dr. Koenig's opinion except that portion of the opinion limiting plaintiff's ability to sit and/or stand to a total of four hours in an eight-hour workday.  In discrediting such portion of Dr. Koenig's assessment, the ALJ set out good reasons therefor, and specifically, that there existed no credible medical reason for such a limitation, that plaintiff engages in no physical therapy or pain therapy for any musculoskeletal or any other condition, that plaintiff takes no strong pain medication, and that plaintiff lacks

most signs typically associated with chronic and severe musculoskeletal pain. (Tr. 14.) Indeed, as found by the ALJ, there exists no x-rays or other laboratory or diagnostic testing to support Dr. Koenig's assessment that plaintiff is limited to such a degree. See 20 C.F.R. § 404.1527(d)(2) (for opinion of treating physician to be given controlling weight, it must be supported by medically acceptable clinical and laboratory diagnostic techniques). In addition, such a limitation is inconsistent with other substantial evidence on the record, and specifically, plaintiff's own account of his daily activities as well as his statement that on an average day, from approximately 7:00 a.m. to 10:00 p.m., he needs to lie down on only two occasions for up to an hour at a time. See id. (for opinion of treating physician to be given controlling weight, it must not be inconsistent with other substantial evidence in the record).

Contrary to plaintiff's assertion, the ALJ here did not conveniently mold the evidence to conform to his alleged predisposition to deny plaintiff benefits. A review of the record shows the evidence, as a whole, to be just as the ALJ summarized and analyzed it. Unlike the ALJ in Cline v. Sullivan, 939 F.2d 560 (8th Cir. 1991), cited by the plaintiff here in support of the instant argument, the ALJ in this cause did not develop the evidence during the hearing process in such a manner to support his ultimate adverse conclusion. Instead, the ALJ fully and

impartially evaluated and resolved the evidence which had been properly developed through the administrative process. Contra Cline, 939 F.2d at 569 ("The hearing record indicates that the substantive aspects of the ALJ's examination of the appellant were exclusively directed towards eliciting from appellant the very 'inconsistencies' later cited by the ALJ as cause to deny appellant's claim.").

Where certain limitations detailed in a physician's Medical Source Statement stand alone, that is, where they are never mentioned in the physician's numerous records of treatment, nor are supported by any objective testing or reasoning indicating why the claimant's functioning need be so restricted, an ALJ does not err in discounting such unsupported portions of the Statement. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). An ALJ is not required to either credit or disregard the report of a treating physician in toto. Craig v. Apfel, 212 F.3d 433 (8th Cir. 2000). Instead, the ALJ may rely on some of the physician's conclusions where they are properly supported and discount others where they are not. Id. Because the ALJ properly found there to be no support in the record for Dr. Koenig's statement that plaintiff could not sit and/or stand more than four hours in an eight-hour workday, he did not err in giving no weight to that portion of Dr. Koenig's Medical Source Statement.

2. *Dr. St. John*

In his written decision, the ALJ determined Dr. St. John's July 2004 Medical Source Statement not to be credible to the extent it imposed limitations more restrictive than those imposed by Dr. Koenig in her May 2003 Statement, noting that "[t]he opinion of a chiropractor may be considered as part of the medical evaluation but is not required to be so considered because a chiropractor is not listed as an 'acceptable medical source' under 20 CFR 404.1513(d)." (Tr. 14.) Plaintiff argues that the ALJ's determination to discredit Dr. St. John's assessment "simply because it was from a chiropractor" runs counter to 20 C.F.R. § 404.1513(d), which permits the Commissioner to consider evidence from "other sources," such as chiropractors. For the following reasons, plaintiff's argument is misplaced.

The claimant bears the burden to furnish evidence to the Commissioner to support a claim of disability. 20 C.F.R. § 404.1512(a). Evidence from "acceptable medical sources" is needed to establish the existence of a medically determinable impairment. 20 C.F.R. § 404.1513(a). A chiropractor is not considered to be an "acceptable medical source" for the provision of such medical evidence, 20 C.F.R. § 404.1513(a), (d), and a chiropractor's medical conclusions need not be relied upon in determining whether a claimant is disabled. Ingram v. Chater, 107 F.3d 598, 604 n.4 (8th Cir. 1997). However, evidence from a chiropractor may be used

to show how an impairment affects a claimant's ability to work. 20 C.F.R. § 404.1513(d); see also Cronkhite v. Sullivan, 935 F.2d 133, 134 (8th Cir. 1991).

In this cause, the ALJ considered the evidence from Dr. St. John and discredited his July 2004 assessment only "[t]o the extent [it] can be interpreted as even more restrictive" than Dr. Koenig's assessment. (Tr. 14.) Contrary to plaintiff's assertion, the ALJ did not discredit Dr. St. John's assessment in its entirety. Nevertheless, the ALJ did not err in according Dr. St. John's assessment the weight given.

First, and as properly noted by the ALJ, the Commissioner *may* consider evidence from a chiropractor in determining a claimant's disability but, under the language of the Regulations, is not required to do so. 20 C.F.R. § 404.1513(d) (in addition to evidence from acceptable medical sources, Commissioner "*may* also use evidence from other sources" to show severity of impairments and their affect on ability to work) (emphasis added). Further, a review of the ALJ's decision shows that he did indeed consider evidence from Dr. St. John as shown by his determination to discredit only a portion of Dr. St. John's findings. Finally, to the extent the ALJ determined to discredit only that portion of the assessment which was more restrictive than Dr. Koenig's findings, such determination is supported by substantial evidence on the record as a whole.

A review of both assessments shows both Dr. St. John and Dr. Koenig to have similarly opined that plaintiff's impairments caused various limitations. In Dr. St. John's assessment, however, he imposed the following limitations which were more restrictive than those imposed by Dr. Koenig: that plaintiff could frequently lift and/or carry five pounds and occasionally lift and/or carry ten pounds (Dr. Koenig found ten pounds frequently and twenty-five pounds occasionally); that plaintiff could sit and/or stand for a total of three hours in an eight-hour workday (Dr. Koenig found such limitation to be four hours); that plaintiff should never engage in pushing and/or pulling (Dr. Koenig found plaintiff able to do such activity occasionally); and that plaintiff should never reach (Dr. Koenig found plaintiff able to do such activity occasionally). For the same reasons cited by the ALJ in determining to discredit that portion of Dr. Koenig's assessment limiting plaintiff to sit and/or stand for only four hours, <u>see</u> discussion <u>supra</u> at Section V.B.1, the more restrictive limitations stated by Dr. St. John are likewise discredited. Specifically, there exists no credible medical reason for such limitations; plaintiff engages in no physical therapy or pain therapy for any musculoskeletal or any other condition; plaintiff takes no strong pain medication; plaintiff lacks most signs typically associated with chronic and severe musculoskeletal pain; there exist no x-rays or other laboratory or diagnostic testing to support limitations to such a degree; and such limitations are significantly inconsistent

with other substantial evidence on the record, most notably, plaintiff's own account of his daily activities.

Accordingly, the ALJ did not err in his determination to discredit that portion of Dr. St. John's July 2004 assessment to the extent it found limitations more restrictive than those found by Dr. Koenig.  See Hogan, 239 F.3d at 961; Craig v. Apfel, 212 F.3d 433; Ingram, 107 F.3d at 604 n.4.

C.    RFC to Perform Work

Plaintiff claims that the ALJ erred in his determination that plaintiff retained the RFC to perform certain sedentary and/or light jobs.  Specifically, plaintiff argues that the ALJ's finding that plaintiff could not sit or stand for more than one hour at a time precludes such work.  For the following reasons, the ALJ's determination that the plaintiff can perform such other work is not supported by substantial evidence on the record as a whole and the cause should be remanded for further proceedings.

As an initial matter, the undersigned notes that plaintiff claims the ALJ to have erred in relying on the Medical-Vocational Guidelines in determining whether plaintiff was disabled and, further, that the ALJ erred in failing to pose to a vocational expert plaintiff's non-exertional impairments of pain as well as his postural and environmental limitations.  A review of the record and the ALJ's decision belies these assertions.  Contrary to plaintiff's contention, the ALJ recognized plaintiff's non-exertional limitations, included them in his RFC determination and

posed a hypothetical to a vocational expert which set out various of such limitations. To invoke this process was proper. <u>Ellis v. Barnhart</u>, 392 F.3d 988, 996 (8th Cir. 2005); <u>Shannon v. Chater</u>, 54 F.3d 484, 488 (8th Cir. 1995). Although the ALJ referred to the Guidelines in his determination not to find plaintiff disabled, he did not rely on the Guidelines alone in this determination. Instead, the ALJ here supplemented such reference with vocational expert testimony in his attempt to meet the Commissioner's burden of demonstrating that there exists other work in the national economy that the plaintiff could perform. <u>Thompson v. Bowen</u>, 850 F.2d 346, 350 (8th Cir. 1988). Inasmuch as the ALJ supplemented the record with testimony from a vocational expert, the ALJ's mere use of the Guidelines as a general framework was not error. <u>Id.</u>

Nevertheless, a review of the hypothetical posed to the vocational expert shows it not to include all of plaintiff's limitations which the ALJ found in his decision to be credible and supported by substantial evidence. In his written decision, the ALJ determined plaintiff's RFC to be restricted by certain exertional and non-exertional limitations, including the limitation that plaintiff could not sit or stand for more than one hour at a time. (Tr. 16.) A review of the hypothetical question(s) posed to the vocational expert, however, shows the expert never to have been questioned about this "one hour at a time" limitation. As such, the expert never testified as to whether a person with such a limitation, coupled with plaintiff's other impairments and

limitations, could engage in any work activity.

A hypothetical question posed to a vocational expert must include all physical and mental impairments the ALJ finds to be credible. House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994). Where the hypothetical fails to include such impairments and their limitations, the vocational expert's testimony given in response cannot serve as substantial evidence and the ALJ's reliance on such testimony is reversible error. Grissom v. Barnhart, 416 F.3d 834 (8th Cir. 2005) (ALJ found claimant to have non-exertional mental impairment but failed to include it in hypothetical); Pickney v. Chater, 96 F.3d 294, 296-97 (8th Cir. 1996) (same). In his written decision here, the ALJ found plaintiff to have the additional non-exertional limitation of not being able to sit or stand more than one hour at a time. Because the ALJ failed to include this non-exertional limitation in his hypothetical question(s) posed the vocational expert, his reliance on the vocational expert's testimony to determine plaintiff not to be disabled is not supported by substantial evidence. The matter must therefore be remanded so that the Commissioner can obtain further vocational expert testimony in response to a hypothetical question which includes all of plaintiff's impairments and their respective limitations found to be credible and supported by substantial evidence.

The plaintiff appears to argue that the Social Security Rulings and Regulations dictate that the ALJ's one-hour sit/stand

finding precludes the performance of *all* work and thus that plaintiff should be found conclusively disabled. (Pltf.'s Brief at 11-12.) Citing <u>Coleman v. Heckler</u>, 572 F. Supp. 1089 (D. Colo. 1983), plaintiff argues that the ALJ's sit/stand finding precludes even sedentary work inasmuch as the Regulations contemplate a primary requirement that to perform such work, a person must be capable of sitting all day. Assuming without deciding that plaintiff's legal proposition is correct, it nevertheless is relevant only if the case were to be decided under the Guidelines. <u>See</u> <u>Willis v. Heckler</u>, 762 F.2d 1014 (6th Cir. 1985) (table, text in Westlaw, No. 84-3477) (citing <u>Coleman</u>). Here, the ALJ found plaintiff not able to perform the full range of sedentary and/or light work inasmuch as he was limited by various non-exertional limitations and, as such, the ALJ solicited the testimony of a vocational expert. Inasmuch as the decision as to plaintiff's ability to perform work here is not reliant solely on the Guidelines, the basic Guideline assumption proffered by plaintiff that a person considered able to perform sedentary work must be able to sit all day is not relevant in this cause of action.

Therefore, for the foregoing reasons, the undersigned determines that the Commissioner's decision that plaintiff is able to perform other work in the national economy is not based upon substantial evidence on the record as a whole and the cause should

be remanded to the Commissioner for further proceedings. Because the record does not conclusively demonstrate that plaintiff is entitled to disability benefits, it would be inappropriate for this Court to award plaintiff benefits at this time.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and this cause shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

Judgment shall be entered accordingly.


_____
UNITED STATES MAGISTRATE JUDGE



Dated this _10th_ day of March, 2006.